Final argument of the morning is Appeal No. 222831, Jennifer Hohman v. the Commissioner of Social Security. Mr. Duncan, nice to see you. Good morning, Your Honors. May it please the Court, Dana Duncan on behalf of Jennifer Hohman. The claimant was 51 years of age at the time of the alleged onset. The ALJ found she was limited to light exertional work. At age 51, if limited to sedentary work, she would have met the GRID rule, so that's one of the reasons why the second issue in this case was brought forward, which is her subjective statements could very well have led to a favorable decision. First issue, though, is the one I'll address. We're back before the Court again on vocational testimony. And I think that what I'm getting or what I'm seeing in some of the district courts is that they're upholding these if there's any method discussed. And while the agency wants to say that my standard or what I'm asking for is excessive, that I'm asking for precision, I'm not. The testimony from the vocational expert has to be at least sufficient for a reviewer, whether it be counsel for the claimant, whether it be the ALJ, whether it be a district court, the appeals counsel, whoever, to trace the path of reasoning employed by the vocational expert. And in this particular case, he provides statements about weighing evidence and putting a weighted estimate, but there's no real explanation for any of it. The HALEX, which the judge is supposed to follow, I think was adopted pretty much or follows along the path of BSTIC, which says that when a response is provided, it has to be understandable to the average person. Mr. Duncan, how do we distinguish this case from FETTING? Because it seems like the methodologies used by the vocational expert in both cases were pretty similar. Okay. The problem comes in, again, that FETTING was a little more detailed and a little more precise as to how he went about going through it. More detailed than this? This one seemed more detailed to me than FETTING. Except that he provided a lot of testimony, but the testimony doesn't say a whole lot. That's the problem. Let me just put it this way, all right? It's easy enough to do. If the vocational expert would have simply provided the following, we have the one SOC code that had 14 DOT codes in it, okay? If he says that I don't use a computer program like Job Browser Pro, which he did, and I don't use the EOQ, the Occupational Employment Quarterly, I do my own calculations. And what I did was, is I looked at the 14 jobs, and based on my knowledge and experience, eight of those jobs do not exist in significant numbers. So that leaves six of those jobs left. And I've done a market study on two of those jobs, and I know that a predominant number of those jobs fall into those two categories, into those two occupations. And so therefore, I came up with an estimate based on that to provide it. That's clear. I would, if that was the testimony, I would not be here today. But it's not. What we have is just a lot of vague statements that do not provide a whole lot. Mr. Duncan, I see this case, maybe you'll disagree with this, but do you know that Mr. Forbes argued a case called Brace? Yes. Do you know Brace? Yes, I'm very familiar. Okay. So I view Brace and Fetting as kind of bookends here. And I think this, to me, could it be clearer? Of course it could be. But it seems much closer to Fetting than it does to Brace. And in Brace, I was on the Brace panel, got Brace right here. Okay. What made very little sense to us in Brace is there was this repetition of I waited this, I waited that. Hold on. What are you talking about? We don't have any idea what that means, okay? But here, and this is where you're probably going to disagree, and it's going to benefit to hear you do it, okay, here, Mr. Hyman, right, he's the VE, Tom Hyman? Yes. Okay. Mr. Hyman here uses the word waiting in a quite imprecise way. I'll give you that, okay? But I can follow, I think, what he's saying. And what he's saying is that when you look at the 14 jobs, I think this particular applicant can perform the role of a mail clerk. Equal distribution gives you $85,000. I don't buy $85,000, okay? And I think the mail clerk is more weighted, forgive the term, toward $40,000. Why? Because some of these have been absorbed by modern technology, some of these positions, et cetera. Okay. Could you be more articulate with that? Of course you can. But you get the gist of it. In other words, I read this, I get how he arrived at it, I get what he drew upon. Is he fully showing his work? No. That's a fair observation. But is that the standard to which we should hold him? The standard which we should be able to hold him to is so that we have the ability to point out when that logic is flawed. Okay? If we're in a situation where, even in this particular case, I have no idea exactly how he weighed it, he was given multiple opportunities to do it, and I still have no clue exactly how he came up to that $40,000. If he just provided just brief statements as to how he came up with it, then I have an opportunity, I mean, this was not my case, but I would have had an opportunity to ask him questions and see if his statements were... Why isn't his testimony that he did it based on his 25 years of experience and job placement sufficient to explain why? Because... Because the test is, is it understandable to the layperson? Okay. Because 25 years of job placement does not necessarily mean that he has the ability to come up with numbers that range across the entire United States. That's the flaw in the logic, which is vocational experts are trained to place individuals and are trained to deal with their limitations. They're not statisticians, but they're asked to become statisticians. But he testified here that he had conducted, I think, over 2,000 surveys of labor markets covering virtually every metropolitan area. He had taken notice of some of the proprietary software. He's giving the base, more than just, oh, I've been doing this for 25 years, he's putting meat on the bones. Why isn't that sufficient? Okay. I... As I indicated in the brief, page 65 of the record, Mr. Heinemann's testimony in regards to his job or his labor market studies, I made no heads or tail out of what he was saying. And that's the problem that comes up, is that if I can't be able to cross-examine the attorney, or as the attorney, the vocational expert in such a way that I am satisfied that their testimony is based upon something other than an educated guess, then it throws all of the step five consideration out the window. I mean, these cases rest most of the time at step five on the vocational testimony. And if we continually have vocational testimony that's unclear and that prohibits proper and full cross-examination, at some point in time, it's pointless. Mr. Duncan, one thing I have no doubt about is, had you cross-examined Mr. Heinemann, I think you would have said, I have no idea what you just said. Yes, I would have. I've done it multiple times. Right. You're using the term waiting. You're talking about studies. You need to get a lot more specific, because at that level of generality, I have not a clue what you're saying. Correct. Okay. That's not the exam that was conducted here. I know. We're left with the record we're left with. Well, the only thing I can indicate is, is the judge ultimately decided it based upon the fact that he said that he's done these market studies. And that's even less clear than what is even there. The attorney of record did ask on several occasions, you know, what do you mean by weighing it? He was given multiple opportunities, and he never clarified it. Okay. You want to save some time, or you want to address fibromyalgia now, or you want to save it? The only thing, I'll just use it and go. No, we'll give, I mean, we're going to give you some time. Go ahead. Okay. The only thing I wanted to indicate on the fibromyalgia is, is the standard of review that's being put in some of the decisions now is the record fails to fully substantiate the allegations of disabling symptoms. That seems to imply that the claimant has to be found totally credible, consistent with the record in order to have a credibility finding. And in this particular case, her testimony was that she has difficulty with standing for lengths of time, which would support a sedentary restriction. She has other problems associated with it. There's case law in the district courts that have indicated that this seems to imply a standard of review that's beyond what the statute allows. And, I mean, 20 CFR 404.1529C2 indicates we will not reject your statements about the intensity or persistence of your pain or other symptoms about the effect your symptoms have on ability to work solely because the available objective medical evidence does not substantiate your statements. And that is ultimately what ends up happening in this particular case. I understand that the judge has wider discretion in these cases, but the standard of review should be clearer and should indicate why specifically, what was contrary to her statements. I mean, this is a fibromyalgia case. It's not like there's an MRI that we can look at. So I'm going to make, hold on, when you were saying the case law is getting a little sloppy in your view, our case law, district court case law, what case? The district courts have been looking at this and raising this as being somewhat suspect. I don't think this court has had a chance. The proper framing of this is 12-2P, right? Yes. And that ruling outlines all of the different medical conditions, findings, and such that you're supposed to take into account. And I think the brief lays out that you consider these for your step two analysis, is it a severe impairment? Then they go on to step three and decide whether or not there's a listing that's equaled because there is no fibromyalgia listing. And then from there, the findings that you make, whether it be IBS, whether it be depression, et cetera, those are then converted into the residual functional capacity. And one of the things that you have to take into account, and it specifically indicates in there that subjective statements have to be taken into account and weighed when you're doing this. If we're putting a standard of review that's in excess of what the statute says, then I question whether that was ever really done. Okay, very well. Appreciate it. Ms. Hugo? May it please the Court, Megan Hugo on behalf of the Commissioner. I'll start with vocational expert issues since that's how Mr. Duncan started. And in this case, Mr. Hyman's testimony is substantial evidence in support of the ALJ's decision that approximately 130,000 national jobs existed that Ms. Holman could perform. Counsel is focusing on what's missing from the vocational expert's testimony, but that approach ignores the substantial evidence standard. Properly focusing on what the vocational expert in this case did say, it is clear that his And indeed, the Court recently reaffirmed in the Fetting and Sock cases vocational expert testimony that is very similar to the testimony that Mr. Hyman offered here. In this case, Mr. Hyman identified the source of his job numbers, which was national jobs data from the Bureau of Labor Statistics, and then he explained how he analyzed that data. He said that he makes a weighted estimate based on his professional experience, which data about the existence of current and future jobs and labor market fluctuations. His survey spanned every major metropolitan statistical area in the United States. He also had discussions with thousands of employers and his own colleagues about those same topics, the prevalence of jobs and the economy and labor market variations. You think it's clear enough from the context that when he was talking about the weighting, of how the 85,000 jobs across the 14 codes apply to the mail clerk position in light of his experience and looking at the surveys, and so that's what he means by weighting. Correct. It's a relative determination of the one position across the 14. Correct. And I think that becomes clear when he does go into how he did it with the mail clerk job. He said based on his knowledge of the job market, and in fact, his on-the-ground experience and working in the printing industry, which he said actually involved this type of work, he knows that some of these 14 occupations have been subsumed within other occupations, and some of them have even been eliminated by technology altogether. And I'm not a vocational expert. That's why we have vocational experts, but just looking at the copy of the OEQ that Council attached to his reply brief, it seems on its face reasonable that some of these positions either no longer exist or have been combined. Is it necessary to have testimony about the reliability of the methodology in terms of being accepted in the community? I don't think this Court has ever said that the vocational expert has to affirmatively say my methodology is reliable and accepted. I think there's nothing in his testimony here that indicates that he finds it unreliable. In fact, he gave very specific foundations for his numbers, including his extensive experience in the industry and in placing people in these exact jobs in the past. And the Court recently reaffirmed this very approach in Fetting and Sock, and endorsed this approach in Chavez when it said that vocational experts could support their estimates with knowledge of the job market that they have obtained through job placement. Where's the line? Would it be enough to just say, I've been doing this for 25 years? It has to be case-specific. I mean, if he comes in here and says, I've been doing this for 25 years, and counsel asks no further questions that cast doubt on that, I think that's a Fetting and a Coyer forfeiture case. If then the attorney comes in and says, what's your experience? And the experience has nothing relevant to do with the job numbers, then I think the ALJ, it's incumbent to ask more. So it is a case-by-case inquiry. But the Court has said that as long as there's nothing that casts doubt on the reliability of the testimony, the ALJ has no duty to inquire further. And so in this case, given all the industry of reliability in his testimony where he gave the source of his numbers, he outlined his process, he gave a specific example, he said he had experience in the industry, and he explained why he thought that some of these jobs shouldn't be included in the weighting, that's a sufficiently reasonable example under this Court's precedent. Again, you know, this testimony is very similar to what the Court found reasonable in Fetting and Sock recently. The vocational expert who was the same individual, Mr. Gooseloff, in both cases broadly testified that he looked at the composition of the larger SOC group and then estimated the number of jobs available to claim it based on the knowledge of the labor market and gain from 30 years of job placement. You know, similar to those cases, I think the Court should find here that Mr. Hyman gave enough detail about his sources and his process and that he could rely on his significant professional experience to produce a reliable estimate for the ALJ to accept as reasonable. And turning to fibromyalgia, you know, if I understand counsel's argument that I think he's saying that the ALJ used the wrong standard in evaluating her complaints because the decision has not failed to fully substantiate language. And, you know, this Court has rejected that that reflects a misunderstanding or a misapplication of the proper standard. In the Gadatus v. Saul case, the Court basically said— Say what case again? Gadatus, G-E-D-A-T-U-S v. Saul, rejected this very argument that by using any sort of boilerplate it reflects a misunderstanding of the standard of review and just said basically, you know, that's just a polite way of saying that the evidence didn't fully substantiate her claims. And, again, the Court has had many decisions where it says that the use of boilerplate is not reversible as long as the ALJ gives sufficient reasons for the subjective symptom analysis. And that's exactly what the ALJ did here. I think it is important to note, though, that the ALJ didn't fully reject her complaints and, in fact, gave credence to some of her subjective allegations. The ALJ limited her to light work, which is consistent with what the state agency experts said was appropriate, but explained that she included more restrictive postural limitations to account, in part, for her testimony. The ALJ also limited Ms. Holman to work involving occasional social contact and work that could be performed independently. Again, that's more restrictive than what the state agency psychologist suggested, and the ALJ explained that was due, in part, to give deference to her testimony. And significantly— You know, the social condition is important to me here because I actually think that's what fully aligns with her testimony. So, when I read her testimony, she's very much talking about difficulty that she experiences working with others, working in teams, working in group settings, and how she experiences a lot of anxiety, and with the anxiety comes the pain and all that. That's where I think Mr. Duncan has a hard time on the RFC because the ALJ picked up on that and then included that social limitation. Absolutely. And again, that's above and beyond what the state agency experts indicated was necessary. And you're absolutely right, Ms. Holman testified that the stress of working around people was her biggest challenge in keeping a job, and that such stress tended to trigger her fibromyalgia symptoms. So, the ALJ, you know, took into account her testimony, and to the extent that her allegations were supported by the record, accounted for that and tailored a residual functional capacity that accounted for her limitations as they were substantiated by the record. Where the ALJ departed from Ms. Holman's allegations, he gave a sufficient explanation that did not rely solely on the objective medical evidence. First, the ALJ considered that Ms. Holman had undergone a generally conservative course of treatment and that her medications had controlled or reduced her symptoms. And that is borne out by the record. Ms. Holman herself told her psychiatrist that her fibromyalgia pain was greatly diminished when she restarted Cymbalta. The ALJ also considered that Ms. Holman was first diagnosed with fibromyalgia in 2013 but continued to work full-time without report of physical limitations or difficulties until April 2018. He considered that her daily activities were inconsistent with her subjective complaints, that she made inconsistent statements about her physical limitations. For instance, the ALJ noted that Ms. Holman told the psychological examiner that her physical health over the years was in the normal range. And the ALJ appropriately did consider the objective medical evidence. Even in cases of fibromyalgia, the Social Security Act, the rulings, and the regulations direct ALJs to consider objective medical evidence. And the ALJ appropriately did that here, noting records where she was in no acute distress, she had normal range of motion, normal muscle tone, full strength, and intact sensation. And this court in the Gebauer v. Saul case noted that the agency's guidance on how to evaluate pain, which is fibromyalgia's chief symptom, directs ALJs to consider such objective findings like the ALJ considered here. So in short, the ALJ did accept some of Ms. Holman's complaints and accounted for them in the residual functional capacity and provided a sufficient explanation of why he did not accept her account of disabling symptoms. And if the court has no further questions, I respectfully request that you affirm the district court. Thank you, Ms. Hugo. Mr. Duncan? Thank you. I'm going to take one last shot at trying to convince you of the difficulty of this situation. Okay, we're sitting in a hearing and we have no idea what the vocational expert is going to say. We have no idea what jobs they're going to provide. We have very limited idea of what the administrative law judge is going to provide for a hypothetical question. Now, the last two hearings I've had myself because I feel that it's almost that the agency is expecting that we prove the vocational expert testimony is flawed so that it's shifting the burden of proof. I filed a both times five-page brief with over 100 pages of additional materials from the ALJ. That's the steps that I have to go through in order to establish based on that standard. And these are supposed to be informal hearings and non-attorneys. Were you successful? One of the cases the judge just scheduled for new vocational testimony because he threw up his hands and said you're probably right and I'm not going to go forward. I haven't gotten a decision on the other one yet. But that's the problem that we have. And I would love it if everybody was able to do that but we have a lot of unrept people. We have a lot of people who have non-attorney representatives and a lot of people who just dabble in this. And I have to say that there has to be or should be some standard that when the issue is raised and you've made clear there has to be an objection, has to be at least something that would trigger the knowledge of the ALJ that there's an issue here so that we can get some clarity. Only 5% of denials out of the 1.2 million I think annually are appealed to federal court. Well one great source of clarity would be if the agency would come forward with the system, a new system for this and we'd move away from the equal distribution method. That's not for Ms. Hugo to solve but we've been, I think that discussion started in 2002 quite a while ago. The ORS is available through Job Browser Pro and I've had vocational experts testify that they can't use it because it's not reliable or that they're not allowed to use it, which is false. Which the regulation clearly indicates that they have the ability to use any governmental publication that's deemed reliable and the ORS should be as is the ONET. But that's a problem that hopefully will be resolved but I have about 10 years left and I've been waiting since 1998 for this to be fixed so we'll see. Okay Mr. Duncan, thank you. Ms. Hugo, thanks to you. That concludes this morning's arguments and the court will be in recess.